**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH FROST,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PETSMART, INC.** | : | |
| **Defendant** | : | **NO.  05-6759** |

**MEMORANDUM AND ORDER**

PRATTER, DISTRICT JUDGE                                    FEBRUARY 26, 2007

Joseph Frost claims that his former employer, PetSmart, Inc. ("PetSmart"), violated the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and the Pennsylvania

Human Relations Act ("PHRA"), 43 P.S. §§ 951-963, by terminating his employment.  Mr. Frost

claims that his termination was discriminatory because, he alleges, it was based on his age.

PetSmart filed a motion for summary judgment, which, for the following reasons, the Court will

grant.

**FACTUAL BACKGROUND**

The undisputed facts of this case are not complicated.  PetSmart hired Mr. Frost on

January 1, 1998 to be the Assistant Manager in its Deptford, New Jersey store.   District Manager

Jerry Gordon hired Mr. Frost and was his immediate supervisor.  Mr. Frost was then 46 years

old.  In August 2001, Mr. Gordon promoted Mr. Frost to the position of Manager of the Fairless

Hills, Pennsylvania store.  In April 2004, Paul Bergen became the Regional Vice President of

PetSmart's Northeast Region, which included the Fairless Hills store.  Mr. Bergen supervised

seven District Managers, including Mr. Gordon, who in turn supervised the store managers.  Mr.

Bergen also supervised Roger Dawson, a Regional Pet Care Manager, who was responsible for maintaining pet care standards and ensuring the welfare of the pets in the Philadelphia District stores. Mr. Bergen did not work directly with Mr. Frost or any other store manager. Mr. Frost and Mr. Bergen met approximately two or three times.

Early in the fall of 2004, Mr. Bergen observed that pet loss in the Philadelphia District was "running well above company expectation." (Def. Ex. 12, Bergen Dep. at 32.)  Mr. Bergen requested that Mr. Dawson identify the three stores in the Philadelphia District with the worst performance in pet care. Mr. Dawson identified the stores managed by Mr. Frost, Kevin Allen and Al Dubeck. Consequently, Mr. Bergen asked Mr. Gordon to take corrective action to ensure that these store managers brought their stores back into compliance. Mr. Frost does not dispute the negative evaluation of his store; rather, he contends, and Mr. Gordon has acknowledged, that one easily could find problems in the pet care department of any PetSmart store. (Pl. Ex. B, Gordon Dep. at 235.)

On September 30, 2004, Mr. Gordon placed Mr. Frost on a Performance Improvement Plan ("PIP") and advised Mr. Frost that the pet care performance at his store was "unacceptable." (Pl. Ex. A, Frost Dep. at 78-79; Pl. Ex. B, Gordon Dep. at 158-59, 276.) Mr. Gordon initiated the PIP because of the pet care problems that both he and Mr. Dawson observed. (Pl. Ex. B, Gordon Dep. at 69-70, 282-83.) Mr. Frost acknowledged the PIP by signing it without noting any disagreement with its content, but he denies that pet care improvement was the true motivation. (Def. Ex. 2.) After conducting a 30-day follow-up, Mr. Gordon noted some improvement at Mr. Frost's store but concluded, "pet care is still unacceptable." (Def. Ex. 3; Pl. Dep. at 83-84.) On December 10, 2004, after a 60-day follow-up, Mr. Gordon noted that "[p]et

care continues to be a problem."  (Def. Ex. 4; Pl. Ex. A, Frost Dep. at 86; Pl. Ex. B, Gordon Dep. at 178).  Also in December 2004, District Services Manager Jean LaCasse, who had visited Mr. Frost's store several times, told Mr. Gordon that Mr. Frost's store had "one of the worst looking pet care departments I've ever seen."  (Def. Ex. 14, LaCasse Dep. at 47.)  As District Services Manager, Mr. LaCasse was responsible for ensuring compliance with PetSmart's policies and procedures regarding, among other things, the pet care departments.

On January 1, 2005, Mr. LaCasse replaced Mr. Gordon to become the acting District Manager for the Philadelphia District and Mr. Frost's direct supervisor.  After conducting a 90-day review of Mr. Frost's PIP, Mr. LaCasse noted that "there are still many issues with [Mr. Frost's] performance and his ability to follow proper Policies & Procedures in regards to Pet Care and store presentation."  (Def. Ex. 5.)  Nonetheless, Mr. LaCasse, Mr. Bergen and Patricia Giordano decided to extend Mr. Frost's PIP an additional 30 days.

Mr. LaCasse visited Mr. Frost's store several times thereafter, and in February 2005, he recommended to Ms. Giordano and Mr. Bergen that PetSmart terminate Mr. Frost's employment because Mr. Frost had not adequately improved pet care conditions at the Fairless Hills store.  On February 21, 2005, Mr. LaCasse and Ms. Giordano informed Mr. Frost that PetSmart was terminating his employment.  Mr. Frost was then 50 years old.

Mr. Gordon was two years older than Mr. Frost.  In February 2005, Mr. Bergen was 47 years old, Mr. Dawson was 40 years old, Mr. LaCasse was 41 years old, Ms. Giordano was 47 years old, and Messrs. Allen and Dubeck were also over 40 years old.

**LEGAL STANDARDS**

    **A.    Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case," id. at 325, or offer affirmative evidence which demonstrates that the plaintiff cannot prove his case, Lawrence v. Nat'l Westminister Bank N.J., 98 F.3d 61, 69 (3d Cir. 1996). After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The evidence provided by the nonmovant is to be believed, and the court must draw all reasonable and justifiable inferences in the nonmovant's favor. Anderson, 477 U.S. at 255. The Court of Appeals for the Third Circuit advises that "this standard is applied with added rigor in

4

employment discrimination cases, where intent and credibility are crucial issues." Stewart v. Rutgers, 120 F.3d 426, 431 (3d Cir. 1997).  However, a nonmovant plaintiff cannot defeat a motion for summary judgment by merely restating the allegations of the complaint, but instead must "point to concrete evidence in the record that supports each and every essential element in his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex, 477 U.S. at 322).  Thus, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to defeat a summary judgment motion.  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).

**B.    The Age Discrimination in Employment Act**

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  In order to prevail on an ADEA claim, the plaintiff must prove that age was a "determinative factor" in the discharge or other decision by defendant employer.  Blum v. Whitco Chemical Corp., 829 F.2d 367, 372 (3d Cir. 1987).

Where, as here, there is no direct evidence of discrimination, the burden of proof is governed by the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (assuming without deciding that the McDonnell Douglas framework, developed to assess claims brought under § 703(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), also applies to ADEA actions); Wishkin v. Potter, -- F.3d --, 2007 WL 405875, at *3 (3d Cir. Feb. 7, 2007) (acknowledging that because the ADEA and Title

5

VII serve the same purpose, i.e., to prohibit discrimination in employment against members of certain classes, "it follows that the methods and manner of proof under one statute should inform the standards under the other[] as well"); Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (age discrimination claims proceeded under the McDonnell Douglas framework).  Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the employer's discharge.  If the defendant satisfies this burden of production, the burden shifts back to the plaintiff to show the employer's stated reasons were pretext for discrimination.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

### C.      The Pennsylvania Human Relations Act

The PHRA states that an employer may not, among other things, discharge an employee because of "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap."  43 P.S. § 955.  The same standards and analysis govern claims brought under the ADEA and the PHRA.  Buskirk v. Apollo Metals, 307 F.3d 160, 166 n.1 (3d Cir. 2002) ("Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts"); Martin v. Healthcare Bus. Res., No. 00-3244, 2002 WL 467749, at *5 (E.D. Pa. Mar. 26, 2002) ("The same general standards and analyses are applicable to plaintiff's Title VII, ADEA, and PHRA claims.").

**DISCUSSION**

**A.      Mr. Frost's *Prima Facie* Case**

When the plaintiff alleges unlawful discharge based on age, the *prima facie* case requires

proof that (1) the plaintiff was a member of the protected class; (2) the plaintiff was discharged;

(3) the plaintiff was qualified for the job; and (4) the plaintiff was replaced by a sufficiently

younger person to create an inference of age discrimination.  Keller v. Orix Credit Alliance, Inc.,

130 F.3d 1101, 1108 (3d Cir. 1997) (citing Sempier v. Johnson, 45 F.3d 724, 728 (3d Cir.

1995)).  For the purposes of this Motion, PetSmart has conceded that Mr. Frost has made out a

*prima facie* case.  (Def. Mem. 10 n.8.)

**B.      PetSmart's Legitimate, Nondiscriminatory Reasons for Mr. Frost's
         Discharge**

The employer satisfies its burden of production by introducing evidence which, taken as

true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable

employment decision.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).  Because the

ultimate burden of proving intentional discrimination always rests with the plaintiff, the

employer need not prove that the tendered reason *actually* motivated its behavior.  Fuentes, 32

F.2d at 763 (citing Burdine, 450 U.S. at 253, 254, 256).  Our Court of Appeals has recognized

poor performance as a legitimate business reason for termination.  Healy v. New York Life Ins.

Co., 860 F.2d 1209, 1214 (3d Cir. 1988).

PetSmart asserts that it terminated Mr. Frost's employment because of his deficient

performance following invocation of the PIP processes and Mr. Frost's continuing failure to

follow PetSmart's policies with regard to pet care.  Mr. Frost does not dispute his negative

performance evaluations, or that he was placed on a PIP.  He also does not dispute Mr. LaCasse's determination that his was one of the three worst stores in the region.  Mr. Frost's undisputed poor performance is sufficient to satisfy PetSmart's "relatively light" burden of articulating a legitimate, nondiscriminatory reason for the termination decision.  See Fuentes, 32 F.3d at 763.

###    C.    Mr. Frost's Evidence that PetSmart's Proffered Reasons Are Pretextual

To survive a summary judgment motion, the plaintiff generally must submit evidence which "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication or . . . infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Id. at 762.  Thus, the plaintiff must *either* (1) discredit the proffered reasons, *or* (2) adduce evidence that discrimination was more likely than not a motivating or determinative cause.  Id. at 764.

To discredit the employer's proffered reason, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a fact finder could rationally find them 'unworthy or credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'"  Id. at 764-65 (citations omitted).  Mr. Frost cannot satisfy this burden merely by relying on a showing that "the employer's decision was wrong or mistaken," because the focus is on "whether discriminatory animus motived the employer, not whether the employer is wise, shrewd, prudent or competent."  Id. at 765 (citations omitted).

Mr. Frost contends that Mr. Bergen, PetSmart's Regional Vice President, singled him out

because of his age for criticism, a PIP and termination.[1]  As evidence that Mr. Bergen's decision to terminate his employment was pretext for age discrimination, Mr. Frost points to (1) comments allegedly made by Mr. Bergen and the increase in criticism of Mr. Frost after Mr. Bergen became Regional Vice President; (2) the fact that poor pet care performance, Mr. Frost's major failing, was not uncommon among various PetSmart stores; and (3) the alleged favorable treatment of younger store managers as compared to older store managers.  As discussed more fully below, Mr. Frost has failed to provide the Court with evidence sufficient to discredit PetSmart's proffered reasons or to raise a reasonable inference of pretext.

### 1.   Mr. Bergen's Alleged Comments and Increased Criticism

Mr. Frost contends that he received more write-ups and criticism after Mr. Bergen became Regional Vice President than before, and deduces that Mr. Bergen targeted him because of his age.  Mr. Frost testified that Mr. Gordon told Mr. Frost that he "didn't know what Mr. Bergen had against [Mr. Frost] but that [Mr. Frost] should look for another job."  (Pl. Ex. A, Frost Dep. at 14.)  Even accepting Mr. Gordon's alleged statement,[2] nothing in the record links

---

[1] Mr. Frost testified, and does not now contest, that Mr. Bergen is the only person who allegedly discriminated against him.  (Pl. Ex. A, Frost Dep. at 12-16, 46-47; Pl. Statement of Facts ¶ 19.)  Mr. Frost admits that he never told anyone within PetSmart that he believed he was being discriminated against because of his age (Pl. Ex. A, Frost Dep. at 125), and he admits that he never availed himself of any of PetSmart's internal complaint procedures (id. at 145).

[2] The Court will assume, for the purposes of this motion, that even though Mr. Frost's testimony regarding Mr. Allen's statement is double hearsay, it would be admissible at trial as a party admission.  See Fed. R. Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."); Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1002 (3d Cir. 1988) (where the identity of the declarants is known, and there is evidence that "matters bearing upon [plaintiff]'s discharge were within the scope of their employment," double hearsay testimony involving statements by employees of defendant employer is admissible).

Mr. Bergen's alleged animus to any *illegal* discrimination, let alone to Mr. Frost's age.  See Blum, 829 F.2d at 372 (plaintiff must prove that age was a "determinative factor" in the discharge or other decision by defendant employer).[3]  Moreover, the ADEA does not prohibit new supervisors from having "different priorities or a lower degree of tolerance for certain failings than [a] predecessor."  Angelico v. Agilent Techs., No. 06-348, 2006 WL 2854377, at *5 (E.D. Pa. Oct. 3, 2006).  Certainly, standards of pet care in a pet store would and should be an appropriate matter for concern and attention.

Mr. Frost's own unsubstantiated, subjective beliefs or suspicions alone would not suffice to persuade a rational trier of fact that age was a factor in the termination decision.  Rizzo v. PPL Serv. Corp., Nos. 03-5779, 03-5780, 03-5781, 2005 WL 913091, at *11 (E.D. Pa. Apr. 19, 2005); see also Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (noting that an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment); Martin, 2002 WL 467749, at *6 ("Plaintiff's mere pronouncement or subjective belief that she was terminated because of her race, gender and age is not a substitute for competent evidence.").  On this record, Mr. Frost's beliefs and suspicions are not borne out by any facts, disputed or otherwise, presented to the Court.

---

[3] PetSmart also argues that the fact that Mr. Frost was within the protected age group at the time of his hire and at the time of his promotion to store manager negates any inference that he was subsequently treated in a discriminatory fashion because of his age.  However, Mr. Bergen, the only individual alleged to have acted because of discriminatory animus, was not involved in hiring Mr. Frost, and did not become Regional Vice President until after Mr. Frost's promotion.  Thus, Mr. Frost's age at the time of his hire and promotion is relevant only to show what Mr. Frost already has conceded, namely, that Mr. Gordon, who hired and promoted Mr. Frost, did not discriminate against him.

## 2.    Mr. Frost's Pet Care Performance

Mr. Frost contests the significance of his store's poor pet care performance, arguing that poor pet care is meaningless because virtually every PetSmart store had pet care problems.  In his deposition, Mr. Gordon conceded problems in the pet care department of any PetSmart store, and acknowledged that such problems were common.[4]  Relying on this statement, Mr. Frost argues that the pet care problems in his store were not significantly different or worse than those in other PetSmart stores, though he presents no comparative evidence other than the Gordon testimony referenced immediately above and Mr. LaCasse's testimony that the majority of PetSmart stores in the district did not comply 100% with PetSmart's policies and procedures during any given inspection (Pl. Ex. I, LaCasse Dep. 71-72).

These testimonial references demonstrate at most that any store manager *could* have been criticized or placed on a PIP for any number of reasons – discriminatory, personal, or otherwise – but ostensibly on the basis of poor pet care performance.  Even when viewed in a light most favorable to Mr. Frost, however, these facts do not, without more, raise an inference of pretext or discredit PetSmart's proffered reasons for *Mr. Frost's* termination.

The record convincingly supports PetSmart's proffered nondiscriminatory reasons for Mr. Frost's termination.  PetSmart contends that while Mr. Bergen focused his efforts at reducing pet

---

[4] Mr. Gordon also testified that the Mr. Frost's store was "a tough store" to manage, that the problems experienced by Mr. Frost were not unique to him, and that the sales goals were unreasonable.  However, in that testimony Mr. Gordon was referring to the Broomall store, where Mr. Frost worked until October 1999, not the Fairless Hills store, where Mr. Frost was store manager when he received the poor performance evaluations.  (Pl. Ex. A, Frost Dep. at 33, 113; Pl. Ex. B, Gordon Dep. at 28-29, 48.)  Moreover, there is no suggestion in the record, or even in the briefs, that the termination of Mr. Frost's employment was related – ostensibly or actually – to sales performance.

loss on the locations with the worst performance in pet care and placed more of a managerial emphasis on using written PIPs to address poor performance, this does not, without more, raise an inference of discrimination.  (Def. Mem. 3; Def. Ex. 12, Bergen Dep. at 32-35.)  Mr. Bergen, the only PetSmart employee alleged to have discriminated against Mr. Frost,[5] did not himself identify the "worst" stores.  (Id.)  There is no suggestion in any part of the record that when Mr. Bergen called for identification of the three stores with the most problematic pet care there was any motivation other than a concern about PetSmart's most notable inventory.  Indeed, it was Mr. Dawson and Mr. LaCasse, neither of whom are alleged to have discriminated against Mr. Frost, who identified Mr. Frost's store as one of the three worst offenders of the pet care conditions (Pl. Ex. I, LaCasse Dep. at 111-112; Def. Ex. 13, Dawson Dep. at 16, 19-20), and it was Mr. LaCasse who initiated the termination of Mr. Frost's employment.  Moreover, Mr. Gordon, who is older than Mr. Frost, agreed that Mr. Frost's store was one of "the worst three that we had."  (Pl. Ex. B, Gordon Dep. at 273-74.)

The problems noted at Mr. Frost's store went well beyond a failure to achieve complete compliance with pet care standards; indeed, the record demonstrates that the problems at Mr. Frost's store were widespread and pervasive.  For example, pet cages were scattered and not in order, clipboards tracking sick animals were not properly maintained or in the correct location, bird habitats were dirty and newly arrived pets were not fed the proper food.  (Pl. Ex. B, Gordon Dep. at 165-75.)  Mr. LaCasse's assessment of Mr. Frost's store noted that "many policies and

---

[5] Mr. Frost also does not allege that Ms. Giordano or Mr. Gordon, who also participated in the decision to terminate Mr. Frost, discriminated against him or bore him any age-related animus.  (Compare Pl. Statement of Facts ¶ 19 with Def. Statement of Facts ¶ 19; Frost Dep. at 12-16, 46-47.)

procedures are not currently being followed.  The habitat is not set up according to P&P and still looks very dirty because it is not being cleaned thoroughly twice per week.  6 out of 7 reptile habitats did not have the correct gauges. Some fish are not being fed according to P&P."  (Def. Ex. 5.)  Mr. LaCasse testified that Mr. Frost's store was one of "the worst two I had ever seen in the company and I've probably seen a hundred or more."  (Pl. Ex. I, LaCasse Dep. at 111-12.)

Mr. Frost does not contest the information about pet care conditions and he has failed to point to any evidence that he was "singled out" for any reason other than his poor performance. Indeed, Mr. Frost does not even allege that the individuals who initially identified and "singled out" his store for needing improvement discriminated against him.

### 3. Differential Treatment of Younger Store Managers

Mr. Frost contends that only older store managers were placed on PIPs and that younger store managers who had similar performance problems were not disciplined or terminated.  As evidence, Mr. Frost submits his own observation that stores run by older managers "seemed to be having the same problems I did, that they were on the way out" (Pl. Ex. A, Frost Dep. 15), and the observation of Kevin Allen that several younger managers stated they had not been disciplined for performance problems similar to those at issue with Mr. Frost (Pl. Ex. C, Allen Dep. at 129-132).  Mr. Frost also testified that he "heard" that at least two younger managers had similar performance problems but were not "written up."  (Pl. Ex. A, Frost Dep. at 18-20, 24.)[6] Mr. Frost and three other store managers over the age of 40 (including Kevin Allen and Alfred

---

[6] Mr. Frost misconstrues Mr. Gordon's testimony about Mr. Bergen's objectives.  Mr. Gordon testified only that he believed Mr. Bergen was targeting certain stores and store conditions and, therefore, the managers of those stores, not that Mr. Bergen was targeting the managers personally.  (Pl. Ex. B, Gordon Dep. at 65.)

Dubeck) were the only PetSmart managers put on a performance improvement plan in 2004.  (Pl.
Ex. B, Gordon Dep. at 284.)  According to Mr. Gordon, the manager ranking criteria was "really
subjective."  (Id.)

 The only evidence regarding the treatment of the younger store managers, namely Matt
McWilliams, Richard Skok, Mike Darden and Bill Flebbe (collectively, "the younger
managers"), is Mr. Frost's own testimony and that of Mr. Allen summarized above.  Mr. Frost
and Mr. Allen, however, both testified that they have no personal knowledge of the store
conditions of stores with younger managers, or of any performance deficiencies or discipline
imposed with respect to the younger managers.  (Pl. Ex. A, Frost Dep. at 18-20, 24-25, 113-14,
156-57; Pl. Ex. C, Allen Dep. at 128-132.)  Their testimony regarding the younger managers is
hearsay or double hearsay.  Mr. Frost has suggested no evidentiary basis to cure the inadmissible
character of this "evidence," and the Court is unaware of any.  The Court may not consider
inadmissible evidence on a motion for summary judgment.  Fed. R. Civ. P. 56(e); Holt Cargo
Sys., Inc. v. Delaware River Port Authority, 20 F. Supp. 2d 803, 839 (E.D. Pa. 1998) (In response
to a motion for summary judgment, the adverse party is required to submit materials "as would
be admissible in evidence."); Edwards v. Schlumberger-Well Servs., 984 F. Supp. 264, 275
(D.N.J. 1997) ("[Plaintiff]'s testimony about what [defendant's personnel manager told her]
would be inadmissible double hearsay.  This Court will not consider such inadmissible evidence
on this motion for summary judgment.").

 Even if the Court were to consider such hearsay testimony, however, the evidence is
insufficient to establish the younger managers as valid comparators.  To establish a valid
comparator, the plaintiff must demonstrate that the younger managers engaged in "the same

14

conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Boykin v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 411 (E.D. Pa. 2000).  Mr. Frost has not shown that the younger managers engaged in the same conduct as Mr. Frost, or that conditions in their stores were the same as the conditions in Mr. Frost's store or, even if they were the same at some point, that they persisted after the invocation of PIP procedures.

Indeed, the evidence indicates just the opposite: that the conditions in Mr. Frost's store, which was independently designated by three individuals as one of the three worst in the region, were worse than those in the stores of the younger managers, which were not among the three worst.[7]  Of those managers whose stores were designated as the worst, Mr. Allen and Mr. Frost were both placed on a PIP and eventually terminated; Mr. Dubeck also was placed on a PIP, but he successfully completed the PIP and remains employed by PetSmart.  (Pl. Ex. I, LaCasse Dep. at 80.)  Thus, Mr. Dubeck may be the only store manager who was similarly situated to Mr. Frost but received different treatment.  Mr. Dubeck, however, is older than Mr. Frost.  (Def. Ex. 15; Dubeck Dep. at 10, 60-61.)

As previously noted, Mr. Frost's own subjective beliefs that he performed as well or better than other store managers are immaterial for the purposes at hand.  The perceptions of the decision makers, not those of the plaintiff, are relevant to establish pretext.  Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) (plaintiff's "view of his performance is not at issue; what matters is the perception of the decisionmaker"), overruled in part on other grounds, St.

---

[7] The three worst stores were those where Mr. Frost, Mr. Allen and Mr. Dubeck were store managers.

<u>Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993).  Mr. Frost's disagreement with PetSmart's decisions is insufficient, as a matter of law, to allow him to survive summary judgment.  <u>Cohen v. Pitcarin Trust Co.</u>, No. 99-5441, 2001 WL 873050, at *7 (E.D. Pa. June 20, 2001).

Moreover, Mr. Bergen, Mr. Gordon and Ms. Giordano, who were all involved in the decision to terminate Mr. Frost, were all members of the protected age class at the time of the termination decision.  The decision makers' membership in the protected class weakens the inference of discrimination.  <u>See</u> <u>Ziegler v. Delaware Cty. Daily Times</u>, 128 F. Supp. 2d 790, 812 n.47 (E.D. Pa. 2001) (noting that because the decision maker was 53 years old when he terminated the 60-year-old plaintiff's employment, "the inference of discrimination is therefore less since the decisionmaker was a member of the same protected class as the plaintiff").

Thus, the evidence presented to the Court is insufficient to raise a genuine issue of fact as to whether similarly situated younger store managers were treated differently than older store managers, or as to whether Mr. Bergen singled out older managers for any reason other than PetSmart's proffered reason: that Mr. LaCasse and Mr. Dawson identified their stores as the worst in the region in terms of a fundamental feature of the PetSmart business.

**CONCLUSION**

Mr. Frost has failed to produce evidence beyond his own allegations and beliefs sufficient to permit a reasonable trier of fact to discredit the nondiscriminatory reasons articulated by PetSmart or to infer that discrimination was more likely than not a motivating or determinative factor in the termination decision.  The record demonstrates only that Mr. Bergen asked his managers to identify those stores with the worst pet care departments, and then initiated PIPs for the managers of those stores.  Although Mr. Bergen was involved in the termination decision,

there is nothing in the record to suggest that the decision was motivated by anything other than

Mr. Frost's poor performance.  Because there is no genuine issue as to any material fact,

PetSmart is entitled to judgment as a matter of law, and the Court will grant the Motion for

Summary Judgment.  An Order consistent with this Memorandum follows.


BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH FROST,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PETSMART, INC.** | : | |
| **Defendant** | : | **NO.  05-6759** |

## <u>ORDER</u>

AND NOW, this 26th day of February, 2007, upon consideration of the Defendant's

Motion for Summary Judgment (Docket No. 9), the Plaintiff's Response in opposition thereto

(Docket No. 16) and the Defendant's Reply (Docket No. 19), it is hereby ORDERED that the

Motion is GRANTED.

It is further ORDERED that the Clerk of the Court is instructed enter judgment in favor

of Defendant PetSmart, Inc. and to close this case for all purposes.

BY THE COURT:

<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE